IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RICHARD BUNN                      *
                                  *
v.                                *
                                  *   Civil Action No. WMN-10-255
OLDENDORFF CARRIERS               *
 GmbH & CO. K. G.                 *
                                  *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**<u>MEMORANDUM</u>**

Before the Court is Defendant's Motion for Summary Judgment.  ECF No. 26.  With his opposition, Plaintiff included a cross-motion for summary judgment, <u>see</u> ECF No. 27, which Defendant has moved to strike.  <u>See</u> ECF No. 29.  The motions are fully briefed.  Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 106.5, and that both of Defendant's motions will be denied, and Plaintiff's motion will be held open pending further briefing.

This case arises from a slip and fall that occurred in the early morning hours of February 16, 2007.  Plaintiff Richard Bunn was a deck foreman employed by CNX Marine Terminals, Inc. (CNX), the owner/operator of a coal loading facility in the Baltimore harbor.  Defendant Oldendorff Carriers GmbH & Co. K.G. is the owner of the MV Christoffer Oldendorff, an ocean-going bulk carrier which, at the time of the incident giving rise to this action, was being used to transport coal.  The relevant

facts concerning the incident, which are largely undisputed, are as follows.

The Christoffer Oldendorff arrived alongside the CNX coal pier in the late afternoon of February 13, 2007. The vessel is equipped with seven holds, numbered sequentially with the No. 1 Hold to the bow or front of the vessel, and the No. 7 Hold to the aft or rear of the vessel, just forward of the deck house. A gangway to board the vessel was placed about mid-ship, near the No. 5 Hold.

When the vessel arrived in Baltimore, the region was experiencing a severe ice storm which delayed the loading of the vessel. During his shifts on February 13th through 15th,[1] Plaintiff worked clearing ice from the coal loading equipment. On the evening of February 15 at about 7 o'clock, Jody White, an employee of CNX and the shift supervisor at the time, boarded the vessel and met with the ship's Chief Officer to take care of routine paper work. When White came on the ship he noticed that, while a path had been cleared from the gangway to the deck house, the rest of the ship was covered with a sheet of ice and there were no other paths cleared. White Dep. at 26. White informed the ship's Chief Officer that the vessel was "icy, slippery" and instructed him that a path to all the holds needed

---

[1] At the time, Plaintiff was working four twelve-hour shifts each week, from 7:00 p.m to 7:00 a.m.

to be cleared and salt and sand needed to be applied in order
for the vessel to be loaded.  The Chief Officer responded and
promised that he would "salt and sand to make it safe."  Id. at
27; see also id. at 37  (White testified that he specifically
informed the Chief Officer that deckmen would need to go to all
of the holds during the loading.).

Because of the cold conditions, White determined that there
should be two deck foremen so that they could take turns
directing the loading on the deck and warming themselves in the
deck house.  Plaintiff was assigned to be a deck foreman along
with Chris Moxey.  Plaintiff and Moxey boarded the vessel and
loading commenced around 1:45 on the morning of February 16,
starting with the No. 7 Hold.  Once loading was completed at the
No. 7 Hold, Plaintiff walked forward along the starboard side of
the ship toward the No. 3. Hold which was scheduled to be the
next hold loaded.  Plaintiff testified that, because there was a
path cleared from the top of the gangway at the No. 5 Hold to
the deck house, he assumed that a path forward along the side of
the ship was also cleared.  Contrary to the Chief Officer's
assurances, however, no additional paths were cleared and the
ice was not salted or sanded.  Plaintiff fell while walking
towards the No. 3 Hold and suffered the injuries that formed the
genesis of this action.

Relying on the Supreme Court's decision in <u>Scindia Steam</u>

<u>Navigation Co., Ltd. v. De Los Santos</u>, 451 U.S. 156 (1981), and

its progeny, Defendant has moved for summary judgment.

Defendant contends that, under <u>Scindia</u>, the primary

responsibility for the safety of longshoremen rests upon the

stevedore, not the shipowner.  The duty of the shipowner when

turning over a vessel to the stevedore is limited to warning of

those rare dangers that are not open and obvious.  Because ice

on the deck of a ship after an ice storm is an open and obvious

danger, Defendant argues that it cannot be held liable for

Plaintiff's injuries.

Summary judgment is only proper if the evidence before the

court, consisting of the pleadings, depositions, answers to

interrogatories, and admissions of record, establishes that

there is no genuine issue of material fact and that the moving

party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A

party seeking summary judgment bears the initial responsibility

of informing the court of the basis of its motion and

identifying the portions of the opposing party's case which it

believes demonstrate the absence of a genuine issue of material

fact.  <u>Id.</u> at 323.  The non-moving party is entitled to have

"all reasonable inferences . . . drawn in its respective favor."

4

<u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1129 (4th Cir.
1987).

Defendant is correct as to the general duty owed to a
longshoreman by a shipowner in the typical situation.
Explaining the impact of the 1972 Amendments to the
Longshoremen's and Harbor Workers' Compensation Act (Act), the
Supreme Court held in <u>Scindia</u> that

> absent contract provision, positive law, or custom to
> the contrary, . . . the shipowner has no general duty
> by way of supervision or inspection to exercise
> reasonable care to discover dangerous conditions that
> develop within the confines of the cargo operations
> that are assigned to the stevedore.  The necessary
> consequence is that the shipowner is not liable to the
> longshoremen for injuries caused by dangers unknown to
> the owner and about which he had no duty to inform
> himself.  This conclusion is plainly consistent with
> the congressional intent to foreclose the faultless
> liability of the shipowner based on a theory of
> unseaworthiness or nondelegable duty.[2]  The shipowner,
> within limits, is entitled to rely on the stevedore,
> and owes no duty to the longshoremen to inspect or
> supervise the cargo operations.

451 U.S. at 172.  Courts following <u>Scindia</u> have repeatedly held

that the shipowner's duty when turning over a ship to the

stevedore is typically limited to warning of hazards that "are

---

[2] Prior to the 1972 Amendments, a longshoreman injured while
loading or unloading a ship could receive compensation payments
from his employer and also have judgment against the shipowner
if the injury was caused by the ship's "unseaworthiness" or
negligence.  Proof of unseaworthiness required no proof of
fault on the part of the shipowner other than an unsafe, injury-
causing condition on the vessel.  This was true even though the
condition was caused or created by the stevedore or its
employees.  See <u>Scindia</u>, 451 U.S. at 164-65 and n.11.

not known to the stevedore and would be neither obvious to nor

anticipated by a skilled stevedore in the competent performance

of its work." Howlett v. Birkdale Shipping Co, S.A., 512 U.S.

92, 105 (1994); see also Pimental v. LTD Canadian Pacific Bul,

965 F.2d 13, 16 (5th Cir. 1992) ("[T]he defendant has not

breached its duty to turn over a safe vessel if the defect

causing the injury is open and obvious and one that the

longshoreman should have seen."); Greenwood v. Societe Francaise

De, 111 F.3d 1239 (5th Cir. 1997) (same).

Were this the typical case, i.e., had an authorized

representative of the shipowner not represented that he would

clear a path and salt and sand the ice, Defendant would be

correct that it cannot be held liable for Plaintiff's injury.

There is evidence in the record in this action, however, that

the Chief Officer did make such a representation.  When a

shipowner voluntarily and affirmatively undertakes to remedy an

unsafe condition, but fails to do so, liability can attach.

Lieggi v. Maritime Co. of the Philippines, 667 F.2d 324 (2nd

Cir. 1981); Bueno v. United States, 687 F.2d 318 (9th Cir.

1983).

In Lieggi, greased wire or cable was spread over a

significant portion of a platform on which the plaintiff

longshoreman was required to work as part of an unloading

operation.  There were also several grease or oil spots on the

platform.  The plaintiff complained to his "gang boss" about

these obstacles and the gang boss located the ship's mate and,

with the mate, inspected the platform.  The mate, after seeing

the wire and grease, "stated that he would have it cleaned up."

667 F.2d at 325.  The gang boss instructed the plaintiff to

continue working.  The wire and grease were never cleaned up,

however, and, while the plaintiff was able to traverse the

platform in the daylight, he tripped and slipped on the wire and

grease in the darkness and was injured.  Like Defendant here,

the shipowner argued that, as a matter of law, it could not be

held liable for the plaintiff's injuries "because it was

entitled to rely on the stevedore to cure the hazardous

conditions that caused the injuries."  Id. at 326.

After reviewing the contours of shipowner liability under

Scindia, the Second Circuit opined,

> [n]otwithstanding the facts that the primary
> responsibility for longshoreman safety is that of the
> stevedore, that the shipowner has no general duty to
> discover an unsafe condition arising during
> stevedoring operations, and that once it has
> discovered such a condition it generally has no
> liability based upon its knowledge alone, the owner's
> ability to escape liability by reliance on the
> stevedore is not limitless.

Id. at 328.  The court continued, citing the portion of Scindia

where the Supreme Court held that, where a stevedore's decision

to continue using defective gear was "'so obviously improvident'

that the owner 'should have realized that the [gear] presented

7

an unreasonable risk of harm to the longshoremen,' the owner

would have a duty to intervene and repair the gear." Id.

(quoting Scindia, 451 U.S. at 175-76). The court then extended

that holding to transitory conditions on a ship: "[I]f the

shipowner knows of the dangerous condition and should anticipate

that, even if the condition is obvious, the stevedore will not

or cannot correct it and the longshoremen will not or cannot

avoid it, the shipowner has a duty to take reasonable steps to

eliminate or correct the condition." Id. (citing Evans v.

Transportacion Maritime Mexicana, 639 F.2d 848, 855-56 (2nd Cir.

1981)).

Applying that principle to the situation where the

shipowner affirmatively undertakes to correct an unsafe

condition, the court concluded,

> by making this affirmative undertaking, the owner
> eliminated any possible reasonable basis for relying
> on the stevedore to correct the hazardous condition.
> Indeed, predictably, the shipowner's undertaking to
> correct the condition lulled the stevedore into
> inaction: the hatch boss testified that although he
> might normally have taken steps to correct the
> condition, he did not do so "because the mate said he
> was going to come and have that wiring removed." In
> the circumstances of the present case, the question of
> shipowner negligence could not properly have been
> taken from the jury.

Id. at 329.

Certainly, the same reasoning is applicable here. A jury

could conclude that, like the gang boss in Lieggi, White had the

8

right to rely on the Chief Officer's representation that he would take care of the ice. As Plaintiff contends, while the presence of ice on a vessel after an ice storm might be an open and obvious danger, it is not open and obvious to a stevedore that a shipowner would fail to correct that condition after promising to do so. Thus, the Court finds that Defendant is not entitled to summary judgment.

The question remains, however, whether Plaintiff is entitled to prevail on his cross motion for summary judgment. Unfortunately, that question is difficult to answer on the present record because, instead of opposing Plaintiff's cross-motion, Defendant elected to move to strike the cross-motion as untimely. Therefore, before reaching the merits of Plaintiff's cross-motion, the Court must address Defendant's motion to strike.

This Court's scheduling order, as modified, set a deadline of November 1, 2010, for dispositive motions. While Defendant's motion was filed before that date, Plaintiff's motion was filed as part of his opposition, which was not filed until November 18, 2010. In addition, under Rule 105.2.c of the Local Rules, when cross-motions are to be filed, the parties are to confer and agree to a sequence for briefing the cross-motions. While Defendant indicated in its status report submitted on October 15, 2010, as well as in a scheduling conference held on October

28, 2010, that it would be filing a summary judgment motion,
there was no indication from Plaintiff that he would be filing
such a motion until it was actually filed.  For these reasons,
Defendant moves to strike Plaintiff's cross-motion.

In opposing the motion to strike, Plaintiff responds that
he was unaware, until receiving Defendant's motion, that
Defendant was not denying that the meeting between White and the
Chief Officer took place.  He also notes that Defendant's motion
did not directly challenge White's testimony concerning the
substance of that conversation.  He then contends that only upon
becoming aware that these particular facts were not in dispute
did he realize that he had grounds for his own motion for
summary judgment.

In its reply to Plaintiff's opposition to the motion to
strike, Defendant counters that Plaintiff was well aware of
Defendant's position on this issue long before the summary
judgment motion.  Defendant represents that it has never denied
that a conversation took place between White and the Chief
Officer, but also argues that "[w]hat was actually said and
understood between [White and] the Chief Officer is both
disputed and irrelevant."  Reply at 1.  As evidence of its non-
denial that some conversation took place, Defendant cites its
supplemental response to Plaintiff's Interrogatory No. 16.  That
interrogatory response, however, simply states that White was on

deck a few hours before loading began.  It does not specifically
reference any conversation between White and the Chief Officer.

Based on the record submitted to the Court, it cannot be
readily determined whether the basis for Plaintiff's filing of a
summary judgment motion was sufficiently clear prior to
Plaintiff's receipt of Defendant's motion.  The court does
conclude that the absence of any substantive factual challenge
in Defendant's motion concerning the White/Chief Officer
conversation could have been enough of a surprise that
Plaintiff's motion will not be stricken.  As noted above, what
Defendant has offered as evidence of its non-denial of the fact
of the conversation makes no actual reference to the
conversation itself.

The Court also recognizes, however, that Defendant is
somewhat justified in concluding that it did not need to
directly respond to Plaintiff's motion.  In addition to an
arguably valid challenge to its timeliness, the Court notes that
the legal authority most supportive of Plaintiff's claim which
is cited and discussed above was not presented by Plaintiff in
his Opposition/Cross-Motion but, rather, was found by the Court
in its own research.  Under these circumstances, the Court
concludes it would be inequitable to deny the motion to strike
and then proceed to address the merits of Plaintiff's motion
without giving Defendant an opportunity to more fully respond.

11

While Defendant has averred in its pleading that it disputes
what was said and understood between White and the Chief
Officer, Defendant has thus far presented no evidence suggesting
any dispute.[3]

Accordingly, the Court will grant Defendant until January
31, 2011, to file a supplemental opposition to Plaintiff's
motion.  If Defendant files such a supplemental opposition,
Plaintiff shall have until February 14, 2011, to file any
supplemental reply.  The Court notes that in the scheduling
conference held on October 28, 2010, the parties expressed the
desire to be referred to a magistrate judge for a settlement
conference upon the resolution of Defendant's motion.[4]  Should
the parties mutually agree that the case is now in a posture
where it would be better to expend the parties' resources
exploring the possibility of settlement than on further
briefing, the parties should request a referral for a settlement
conference by letter to my chambers on or before January 24,
2011.

---

[3] The Court is aware that providing such evidence might be
difficult as it appears the parties have not been able to depose
the Chief Officer.  See Joint Status Report dated October 15,
2010 (indicating that the Chief Officer was then in the Ukraine
and implying that it was proving difficult to find "a mutually
convenient (or less inconvenient) means" of conducting his
deposition).

[4] Again, in that conference, it was only the Defendant that
expressed the intent to file a dispositive motion.

A separate order will issue.

                  _____/s/_____
                  William M. Nickerson
                  Senior United States District Judge

DATED:  January 14, 2011.